UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

DEANGELO CARROLL,

Petitioner,

v.

STATE OF NEVADA,[1] et al.,

Respondents.

Case No. 2:20-cv-01691-GMN-NJK

**Order Denying First-Amended Petition**

(ECF No. 23)

In his 28 U.S.C. § 2254 Habeas Corpus Petition Deangelo Carroll challenges his first-degree murder conviction, alleging *Miranda* violations and ineffective assistance of trial and appellate counsel. (ECF No. 23.)  The Petition is now before the Court for adjudication on the merits.  As discussed below, the Petition is denied.  The Court grants a Certificate of Appealability on ground 1.

I.    **Background**

The Nevada Supreme Court summarized the facts in this case as follows:

> On May 19, 2005, police discovered Timothy J. Hadland's body on Northshore Road near Lake Mead. Along with Hadland's body, police found advertisements for the Palomino Club. Hadland was fired from his job at the Palomino Club a week before his death. Palomino Club management recruited Carroll to "knock[ ] off" Hadland because Hadland was spreading negative rumors about the club.
>
> Carroll was also an employee at the Palomino Club. Carroll used the club's van to promote the club by handing out flyers to cab drivers and tourists. On the night of Hadland's murder, Carroll drove the club's van with two other men, Rontae Zone and Jayson Taoipu, who occasionally assisted him. Carroll recruited Kenneth Counts for this assignment because Carroll knew Counts would "take care of" someone for money.

---

[1] According to the Nevada Department of Corrections inmate locator page, Carroll is incarcerated at Ely State Prison. The department's website reflects Débora Borgas is the warden for that facility. At the end of this order, the Court directs the Clerk to substitute Débora Borgas for prior respondent State of Nevada, under, *inter alia*, Rule 25(d) of the Federal Rules of Civil Procedure.

Carroll, Zone, Taoipu, and Counts went to an area near Lake Mead, and Carroll called Hadland. When Hadland noticed the Palomino Club's van, Hadland parked his car in front of the van and walked to the driver's side window where Carroll was sitting. As Hadland and Carroll talked, Counts exited the van through the side door, snuck around to the front, and fired two shots into Hadland's head. Counts then jumped back into the van and ordered Carroll to return to town.

Carroll drove directly to the Palomino Club and told club management what occurred. Louis Hidalgo, Jr., the general manager of the club, directed other employees to give Carroll $6,000 in cash to pay Counts. Carroll gave the money to Counts, who then left in a cab. The next morning, at Hidalgo's direction, Carroll bought new tires for the van and disposed of the old tires at two separate locations.

The evening after Hadland's murder, homicide detectives contacted Carroll at the Palomino Club, as Carroll's phone number was the last phone number on Hadland's phone. When the detectives asked to speak with Carroll, he agreed, and the detectives drove Carroll to the homicide office for questioning. Carroll sat in a small room at a table with his back to the wall, while the detectives sat between him and the exit. The detectives did not give Carroll *Miranda* warnings before questioning him, but they informed Carroll that he was speaking with them voluntarily. Eventually, Carroll implicated himself, Palomino Club management, and Counts in Hadland's murder.

Carroll then volunteered to wear a recording device to corroborate his story by speaking with the Palomino Club management. The detectives strategized with Carroll before he spoke with the management each time. The information on these recordings allowed the State to charge three members of Palomino Club management for their roles in Hadland's murder.

After the detectives finished obtaining information and evidence from Carroll, they arrested him. The State's information charged Carroll with conspiracy to commit murder and murder with use of a deadly weapon.

(ECF No. 38-17 at 3-4.)

An Eighth Judicial District (Clark County) jury convicted Carroll of First-Degree Murder with Use of a Deadly Weapon and Conspiracy to Commit Murder. (ECF 36-29.) The state district court sentenced him to terms that amounted to life in prison with the possibility of parole after 40 years. (ECF No. 36-42.)  Judgment of Conviction was entered in September 2010. (*Id*.)  An amended judgment of conviction was filed in March 2011. (ECF No. 36-46.)

2

Carroll did not file a timely direct appeal.  In December 2011, Carroll filed a counseled petition for writ of habeas corpus requesting relief under *Lozada v. State*, 871 P.2d 944, 946 (Nev. 1994.)[2]  The state district court held an evidentiary hearing and granted the petition. (ECF Nos. 37-4, 37-5.)

The state district court appointed new counsel, and Carroll filed a direct appeal in May 2013. (ECF No. 37-9.)  The State filed a motion to dismiss the appeal, arguing that both the habeas petition and the notice of appeal had been untimely filed. (ECF No. 37-12.)  The Nevada Supreme Court remanded for the limited purpose of holding an evidentiary hearing on whether Carroll established good cause to excuse the delay in filing his habeas petition. (ECF No. 37-19.)  The state district court conducted an evidentiary hearing and held that Carroll established good cause to excuse the late filing of his postconviction habeas petition. (ECF No. 37-28.)  The Nevada Supreme Court affirmed the convictions and sentences in April 2016. (ECF No. 38-17.)  That court denied Carroll's petition for rehearing and petition for en banc consideration. (ECF Nos. 38-20, 38-21, 38-24, 38-25.)  In May 2017, Carroll filed a pro se state postconviction habeas petition. (ECF No. 38-30.)  The Nevada Court of Appeals affirmed the denial of the petition in February 2020. (ECF No. 38-53.)

Carroll dispatched his federal habeas petition for mailing in August 2020. (ECF No. 7.)  This Court appointed counsel, and he filed a counseled, First-Amended Petition in January 2022 that sets forth 5 grounds for relief:

> Ground 1: The court erred in admitting Carroll's interrogation into evidence despite police failing to comply with *Miranda v. Arizona*, 384 U.S. 436 (1966).
>
> Ground 2: The court erred in admitting Carroll's wire recordings into evidence despite police failing to comply with *Miranda*.

---

[2] The Nevada Supreme Court held in *Lozada* that an attorney's failure to timely file a notice of appeal without obtaining client consent to forgo an appeal could constitute grounds for habeas relief. In *Roe v. Flores-Ortega*, 528 U.S. 470 (2000) the Supreme Court explained that an attorney's failure to pursue an appeal without client consent is subject to analysis under *Strickland v. Washington*, 466 U.S. 668 (1994).

> Ground 3: Carroll's trial attorneys were ineffective because they (A) failed to seek suppression of the wire recordings and (B) failed to impeach Rontae Zone with his prior statement to Calvin Williams.
>
> Ground 4: Carroll's appellate counsel was ineffective for failing to argue that the wire recordings should have been suppressed due to the *Miranda* violation.

(ECF No. 23 at 11-27.)  Respondents have answered the Petition, and Carroll has replied. (ECF Nos. 57, 66.)

## II.    Trial Testimony[3]

On May 19, 2005, Hadland's body was discovered on a road near Lake Mead.[4] Police found flyers from the Palomino Club at the scene.[5]  The State subpoenaed Rontae Zone. (ECF No. 36-19 at 127-241.)  Zone testified that he was living with Carroll at the time and also worked at the Palomino.  They would drive around in a van promoting the club; primarily they handed out flyers to cab drivers.  They also promoted with Jayson Taoipu. On the day in question Zone was working with Carroll and Taoipu. Later in the day Carroll told him that the club owner, Luis Hidalgo, Jr. ("Mr. H."), wanted someone "dealt with." (*Id.* at 131.)  Carroll had a gun and he gave Taoipu a gun and gave bullets to Zone.  Zone later gave Taoipu the bullets.  Zone did not know Hadland. Based on Carroll's actions Zone thought that someone was going to be killed.  Carroll told him that Luis Hidalgo, III ("Little Lou") had said that Mr. H. wanted someone dead. Carroll later went and picked up Kenneth Counts.  He went inside Count's house for about ten minutes and then they both got in the van.  Counts was dressed in all black and wore gloves.  Carroll drove to Lake Mead with Taoipu in the passenger seat, Zone in the backseat behind the driver's seat, and Counts behind the passenger seat.  Zone

---

[3] The Court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court record.  The Court summarizes the same solely as background to the issues presented in this case, and it does not summarize all such material. No assertion of fact made in describing statements, testimony, or other evidence in the state court constitutes a finding by this Court.  Any absence of mention of a specific piece of evidence or category of evidence does not signify the Court overlooked it in considering Caroll's claims.

[4] *See* testimony of Ismael Madrid, ECF No. at 39-19 at 41-54.

[5] *See* testimony of LVMPD detective Jason Lafreniere, ECF No. 36-19 at 54-62.

had never met Counts.  Carroll had phone calls with Anabel Espindola—Mr. H.'s business and romantic partner—Little Lou and then Hadland.[6]  It was dark when they met Hadland on a road on the way to the lake.  Hadland was parked about five feet away; he got out of the car and went to the driver's window of the van to talk to Carroll.  Counts got out of the van, crouched low and snuck around the front of the van.  Zone heard two gunshots, saw a spark and saw Hadland fall.  Everyone else remained in the van.  Counts quickly hopped back into the van and Carroll drove away.  Counts asked Zone why he didn't shoot Hadland; Zone told Counts that he didn't have anything to do with it.

The four returned to the club.  Carroll went in first by himself and was gone for 30-45 minutes.  Carroll came back and got Counts and they both went back into the club.  Counts eventually came outside, got in a cab and left.  Carroll came out and the three drove to a carwash.  Taoipu and Carroll washed the van.  The next day, Zone went with Carroll to a house near a tire shop.  Carroll slashed all four tires, then went into the shop and bought four new tires.  Later Carroll told Zone that Mr. H. had told the police that he knew about Carroll's actions.  Carroll said Counts was paid for killing Hadland and told Zone not to say anything to anyone.

A few days later, Carroll came to see Zone with the police.  When Carroll brought the police, he told Zone "if you don't tell the truth, we're going to jail." (*Id*. at 174-75.)  Prosecutors told Zone that if he did the right thing he wouldn't go to jail.  Zone acknowledged on cross-examination that he had initially lied to police to protect himself.  Carroll never used the words kill or murder, he only said "dealt with." (*Id*. at 176-77.)  Zone had been smoking pot all day the day of the murder.  He acknowledged he smoked pot earlier that day before testifying.  He never heard any conversation between Counts and Carroll; he did not know that Counts had a gun.  Zone said he

---

[6] Hadland's girlfriend testified that they were camping at Lake Mead. (Paijit Karlson, ECF No. 36-19 at 62-86.)  She knew Carroll and said that Hadland got a phone call from Carroll and then left to go meet him to get some marijuana.  That was the last time she saw Hadland.  She also testified that Hadland did not get along with the Palomino's owners and spoke negatively about them.

didn't know if Carroll knew Counts had a gun or knew that Counts was sneaking around to the driver's side. Zone didn't know if Carroll was paid anything. He agreed on re-cross that his main reason for testifying was to avoid a murder charge.

Police had discovered that the last call Hadland received was from Carroll's cell phone.[7] Las Vegas Metropolitan Police Department ("LVMPD") detective Martin Wildemann went to the Palomino the night after the murder to try to get contact information for Carroll. Carroll walked into club; the officers told him they were looking for information about Hadland and that they knew Carroll had called Hadland. Carroll was cooperative and willing to speak with them. Detectives drove Carroll to their office. Detectives told Carroll that he was not under arrest and could return home after the interview. Carroll told them inconsistent stories, one of which was that he thought that Hadland was going to be beaten up, not killed. But he said that Counts flipped out and shot Hadland. Carroll offered to be tested for gun residue. He also offered to wear a wire to corroborate his story. After the interview, Carroll directed police to two sites; they recovered the four tires that had been slashed from two different dumpsters. Then detectives drove Carroll home.

When detectives brought Zone in for questioning his answers were similar to his trial testimony. He said that Carroll told him that Mr. H. wanted someone dealt with, which he understood to mean killed, and that Carroll was talking to Hadland as he stood outside the driver's window when Counts snuck around and shot him in the head.

When SWAT served an arrest warrant on Counts, he fled. Carroll called Wildemann and directed him to the house where Counts was hiding. SWAT eventually apprehended him from the attic. The murder weapon was never found. Detective Michael McGrath searched Counts's residence after he was arrested. He found a black hoodie sweatshirt, black gloves, a case for a large frame revolver, bullets and expended

---

[7] *See* testimony of LVMPD detective Martin Wildemann, ECF No. 36-19 at 241-277, ECF No. 36-22 at 4-104. *See also* testimony of LVMPD detective Michael McGrath, ECF No. 36-23 at 47-181.

casings.  Carroll had said that Counts was paid $6,000 for the killing; McGrath did not find any money.  Police found Counts's driver's license and Palomino Club VIP cards. A revolver was found in the back of a file cabinet.

After Counts was arrested for Hadland's murder Carroll called Wildemann and said that he had received a call from Little Lou.  Carroll told Wildemann that he had met with Espindola and Little Lou at Simone's Auto Body Shop, which Mr. H also owned.  They discussed what happened and made notes regarding what they all would say to police. Later they burned the notes.  On May 23 Carroll wore a wire and spoke with Espindola and Little Lou.  Wildemann recalled that Espindola was recorded saying that they were just supposed to beat up Hadland; no one was supposed to shoot him.  Carroll then wore a wire when he went to the Palomino so that the police could further investigate Mr. H., Little Lou, and Espindola.  When police executed a search warrant at Simone's they found a handwritten note that read: "Maybe we are being under surveil.  Keep your mouth shut!!"[8]  They also found ashes on the bathroom counter.

### III.    Legal Standard & Analysis

#### a.  AEDPA Legal Standard and Analysis

28 U.S.C. § 2254(d), a provision of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), provides the legal standards for this Court's consideration of the Petition in this case:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

---

[8] (ECF No. 36-22 at 49.)

The AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693-694 (2002).  This Court's ability to grant a writ is limited to cases where "there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).  The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the AEDPA standard as "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Lockyer*, 538 U.S. at 73 (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell*, 535 U.S. at 694.

A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 74 (quoting *Williams*, 529 U.S. at 413).  The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be objectively unreasonable. *Id*. (quoting *Williams*, 529 U.S. at 409).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas review. *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id*. The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." 393 F.3d at 973. Rather, AEDPA requires substantially more deference:

> .... [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence. The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Cullen*, 563 U.S. at 181.

### b.  Ineffective Assistance of Counsel

Ineffective assistance of counsel ("IAC") claims are governed by the two-part test announced in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court held that a petitioner claiming ineffective assistance of counsel has the burden of demonstrating that (1) the attorney made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment, and (2) that the deficient performance prejudiced the defense. *Williams*, 529 U.S. at 390-91 (citing *Strickland*, 466 U.S. at 687). To establish ineffectiveness, the defendant must show that counsel's representation fell below an objective standard of reasonableness. *Id*. To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different. *Id.*  A reasonable probability is "probability sufficient to undermine confidence in the outcome." *Id.*  Additionally, any review of the attorney's performance must be "highly deferential" and must adopt counsel's perspective at the time of the challenged conduct, in order to avoid the distorting effects of hindsight. *Strickland*, 466 U.S. at 689. It is the petitioner's burden to overcome the presumption that counsel's actions might be considered sound trial strategy. *Id.*

Ineffective assistance of counsel under *Strickland* requires a showing of deficient performance of counsel resulting in prejudice, "with performance being measured against an objective standard of reasonableness, . . . under prevailing professional norms." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (internal quotations and citations omitted).  When the ineffective assistance of counsel claim is based on a challenge to a guilty plea, the *Strickland* prejudice prong requires a petitioner to demonstrate "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

If the state court has already rejected an ineffective assistance claim, a federal habeas court may only grant relief if that decision was contrary to, or an unreasonable application of, the *Strickland* standard. *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003). There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.*

The United States Supreme Court has described federal review of a state supreme court's decision on a claim of ineffective assistance of counsel as "doubly deferential." *Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). The Supreme Court emphasized that: "We take a 'highly deferential' look at counsel's performance . . . through the 'deferential lens of § 2254(d).'" *Id.* (internal citations omitted).  Moreover, federal habeas review of an ineffective assistance of counsel claim is limited to the record before the state court that adjudicated the claim on the merits. *Cullen*, 563 U.S. at 181-84.  The United States Supreme Court has specifically

reaffirmed the extensive deference owed to a state court's decision regarding claims of ineffective assistance of counsel:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id*. at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S. at 123. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S. at 124. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington*, 562 U.S. at 105.  "A court considering a claim of ineffective assistance of counsel must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Id*. at 104 (quoting *Strickland*, 466 U.S. at 689).  "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Id*. (internal quotations and citations omitted).

### c.  Claims for Relief

#### i.  Ground 1—*Miranda* and the custodial interrogation

Carroll alleges that the trial court erred in admitting his interrogation into evidence when police failed to comply with *Miranda v. Arizona*,[9] violating his Fifth, Sixth, and Fourteenth Amendment rights. (ECF No. 23 at 11-20.)  The Fifth Amendment, made applicable to the States by the Fourteenth Amendment, requires that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const., amend. 5.  The Fifth Amendment right against compulsory self-incrimination includes the  right to remain silent and the right to have counsel present during custodial interrogation. *Miranda*, 384 U.S. at 469.  The *Miranda* Court characterized custodial interrogation as questioning initiated by law enforcement officers after a person was taken into custody "or otherwise deprived of his freedom of action in a significant way."

---

[9] 384 U.S. 436 (1966).

11

*Id.* at 477.  Under *Miranda*, the right against self-incrimination prohibits admission of statements by a suspect during "custodial interrogation" without a prior warning. *Id*.  The intent of the *Miranda* warning is to preserve the privilege during "incommunicado interrogation of individuals in a police-dominated atmosphere." *Id*. at 445.

To determine if habeas relief is warranted for the improper use of *Miranda*-related material, the Court must apply an actual-prejudice standard; it must determine if the error "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 630 (1993).  "This standard is satisfied if the record raises 'grave doubts' about whether the error influenced the jury's decision." *Garcia v. Long*, 808 F.3d 771, 781 (9th Cir. 2015) (quoting *Davis v. Ayala*, 576 U.S. 257, 276 (2015)); *see also Chapman v. California*, 386 U.S. 18 (1967).  A court must then determine whether, under AEDPA, every fair-minded jurist would agree that an error was prejudicial. *Brown v. Davenport*, 596 U.S. 118, 136 (2022).

In *Brecht*, the Supreme Court determined that the state's improper use of the petitioner's post-*Miranda* silence for impeachment purposes was harmless. 507 U.S. at 638–39.  The Court noted that the State had only referred infrequently to petitioner's post-*Miranda* silence.  The Court concluded that because the physical evidence presented at trial suggested that the petitioner had intentionally shot the victim, "the State's evidence of guilt was, if not overwhelming, certainly weighty." *Id*. at 639.

In this case, the night after the murder, police encountered Carroll at the Palomino and he agreed to speak to them.  Detectives drove him to their office.[10]  The officers videotaped the interview from another room and made an audio recording in the room. Carroll was unaware of the video recording.  During the interview, Carroll was seated with his back to the back wall of the room, which could accommodate 3-4 people. Detectives were seated at a table across from him, between Carroll and the door. Detective Wildemann testified that he made it clear to Carroll that he was not under

---

[10] *See* testimony of Wildemann, ECF No. 36-19 at 241-277, ECF No. 36-22 at 4-104.  *See also* testimony of McGrath, ECF No. 36-23 at 47-181.

arrest, and he did not give Carroll *Miranda* warnings because he was not in custody. Later in the interview, after Carroll had made some incriminating statements, detectives read him his *Miranda* rights. Carroll continued to speak with detectives after. He told police several versions of events. In the last version Carroll stated that the plan was to beat up Hadland, but that Counts went rogue and shot him. Carroll told them where to find Counts. Detectives asked Carroll how he could prove his story; Carroll offered to wear a wire. At the end of the interview, detectives drove Carroll home.

In a published opinion, the Nevada Supreme Court first concluded that when Carroll was questioned at the homicide office he was in custody for the purposes of *Miranda* and should have been given *Miranda* warnings at the outset. (ECF No. 38-17 at 14-23.) The court then held that the district court erred by not suppressing Carroll's statements. The court further held that Carroll's statement to police after he received *Miranda* warnings should also have been suppressed:

> **Police interrogation**
>
> . . .
> The detectives chose not to provide *Miranda* warnings until the last of the three detectives began questioning Carroll, which was after he had already made inculpatory statements. Although Carroll was not formally under arrest, he was in custody and should have received *Miranda* warnings. *See Archanian v. State*, 145 P.3d 1008 (Nev. 2006). We therefore conclude that the district court erred by not suppressing Carroll's statements.
>
> **Post-*Miranda* statements**
>
> We additionally conclude that Carroll's statement to police after he received the *Miranda* warnings should have been suppressed pursuant to the Supreme Court's holding in *Missouri v. Seibert*, 542 U.S. 600, 611-12 (2004).
>
> …
>
> The instant case is indistinguishable from *Seibert*. We conclude that the midstream warnings did not properly advise Carroll that he could terminate the interrogation despite his previous inculpatory statements. Carroll's post-warning statements were simply a repetition of his pre-warning statements. The detectives told him that they would take him home and that he would not go to jail if he told them the whole truth. Although police recited the *Miranda* warnings, Carroll was just as dependent upon police to take him

13

home and just as fearful he would go to jail after he received the warnings as he was before. Despite the short break in questioning, Carroll was subjected to a single, continuous course of questioning during which the detectives chose to withhold the *Miranda* warnings. Therefore, the district court should have suppressed Carroll's post-*Miranda* statement to police.

(*Id*. at 21-23.)[11]  However, the court concluded that

[A]lthough the district court erred in admitting Carroll's statement into evidence at trial, the State has shown that the error was harmless. *See Boehm v. State*, 113 Nev. 910, 916, 944 P.2d 269, 273 (1997) (applying harmless error analysis to a statement admitted at trial in violation, of *Miranda*). Aside from Carroll's inculpatory statements to the police, the district court properly admitted other powerful evidence of his guilt. Thus, our review of the record convinces us that this error is harmless beyond a reasonable doubt.

(*Id*. at 23.)

Here, Respondents do not challenge the Nevada Supreme Court's conclusion that Carroll was in custody during his interrogation by the police shortly after Hadland's murder and that detectives should have read him his *Miranda* rights before the interrogation began. (*See* ECF No. 57 at 16.)  But they argue that the state appellate court unreasonably concluded that, while the trial court erred in admitting Carroll's statements both before and after the *Miranda* warnings, the error was harmless in light of the other evidence presented.

During opening statements the prosecution discussed the varied explanations that Carroll gave detectives during the interrogation as to his whereabouts and the events of the night of the murder.[12]  The prosecutor also highlighted that Carroll volunteered to wear a wire in order to prove that the plan was to beat up Hadland not to kill him.  The prosecutor argued: "At the end of this case some things are going to be just uncontroverted.  Plan A.  Plan A's clearly the killing of Timothy Hadland."[13]  Defense counsel did not object to the admission of the interview, counsel only initially objected to

---

[11] In *Missouri v. Seibert*, the Court held that the "midstream recitation of warnings after interrogation and an unwarned confession" violated *Miranda*, so that the statement repeated after *Miranda* warnings were given was inadmissible. 542 U.S. 600, 604 (2004).

[12] ECF No. 36-19 at 21-34.

[13] *Id*. at 34.

prosecution playing only a portion of the interview.[14]  Defense counsel wanted the entirety of the interview presented to the jury because Carroll said "some very favorable things."[15]

Both the prosecution and defense highlighted portions of the interview during closing arguments.[16]  The prosecutor played parts of the interrogation and the wire recordings.[17]  Defense counsel emphasized the instances when Carroll insisted it was supposed to be a battery and when he said he never told Counts that Mr. H. wanted Hadland killed.[18]  Defense counsel urged the jury to consider that Carroll told detectives that he lied initially because he was trying to say what Espindola and Little Lou told him to say, and how that was corroborated by the wire recordings when Espindola discussed with Carroll what they should say to police.

The issue at trial was whether Carroll intended for Hadland to be killed or beaten. Carroll's statements to detectives were clearly damaging but cannot be said to have "formed the backbone of the government's case." *Jones v. Harrington*, 829 F.3d 1128, 1142 (9th Cir. 2016) (the admission of defendant's incriminating statements was not harmless when there was little other evidence before the jury).[19]  The last call Hadland received that night was from Carroll.[20]  Police found the same Palomino flyers that

---

[14] ECF No. 36-19 at 37-38.

[15] *Id*. at 38.
[16] *See* ECF No. 36-27 at 33-100.
[17] *Id*. at 33-61.
[18] *Id*. at 91-95.
[19] Carroll filed a notice of supplemental authority, urging this Court that the recent Second Circuit decision in *Hernandez v. McIntosh* demonstrated that the error here was not harmless. 146 F.4th 142 (2025).  That case is readily distinguishable.  Hernandez, who had a long and well-documented history of serious mental illness, was kept in police presence for about 24 hours. He ultimately confessed to murder in a 40-year-old cold case.  The only evidence in the case was Hernandez's confessions to both law enforcement and non-law enforcement civilians.  His first trial ended in a hung jury; the jury in his second trial sent the judge three notes about what parts of the confession they could consider if they felt the pre-*Miranda* statements were involuntary. The judge responded to the notes with incorrect and/or incomplete statements of the law.  The Second Circuit panel concluded that given the "significant weakness of the State's case absent the confession, no fair-minded jurist could conclude that the instructional error was harmless beyond a reasonable doubt." *Id*. at 164.
[20] *See, e.g.*, ECF No. 36-23 at 92.

Carroll drove the van around distributing near Hadland's body. Zone testified in detail that Carroll told him that Mr. H. wanted Hadland "dealt with," and that it was clear to Zone that that meant killed. Zone said that, at some point on the day of the killing: "[Carroll] told me that Little Lou and Mr. H wanted [Hadland] dead."[21] Defense counsel questioned Zone thoroughly about inconsistencies in his testimony and his motives for testifying. It was for the jury to weigh Zone's credibility. *See United States v. Bailey*, 444 U.S. 394, 414 (1980); *Washington v. Texas*, 388 U.S. 14, 19 (1967); *see also Parker v. Matthews*, 567 U.S. 37, 43 (2012) (holding that a reviewing court may not reweigh witness credibility). Carroll had a gun, he gave Taoipu a gun and gave Zone bullets before they picked up Counts—who was dressed in all black, wearing gloves, and had a gun—and drove to the lake. When Counts was paid for the murder, Carroll told Zone that they could have been paid if they had been the ones who killed Hadland. In some instances, the wire recordings (discussed below) arguably corroborated Carroll's insistence that he only intended that Hadland be beaten. But other parts supported the State's theory that Carroll knew the intent was to kill Hadland.

State courts "are fully competent to decide federal constitutional issues." *Swain v. Pressley*, 430 U.S. 372, 383 (1977). The Nevada Supreme Court reasonably held that the prosecution presented powerful evidence demonstrating Carroll's guilt beyond his statement to the police. *See Morales v. Woodford*, 336 F.3d 1136, 1149 (9th Cir. 2003), amended 388 F.3d 1159, 1172-73 (9th Cir. 2004) (concluding strength of evidence bears upon harmless error review). The other evidence introduced in this case, if perhaps not overwhelming, was "weighty." *Brecht*, 507 U.S. at 638–39. Carroll has not demonstrated that without his interview statements the jury would not have convicted him of first-degree murder, so he has not shown actual prejudice. This Court, therefore, concludes that the state appellate court reasonably held that any error was harmless. Carroll has not shown that every fair-minded jurist would agree that the error was prejudicial. So Carroll has not demonstrated that the Nevada Supreme Court's decision

---

[21] ECF No. 36-19 at 139.

16

on federal ground 1 was contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).  The Court therefore denies federal habeas relief as to ground 1.

### ii.  Grounds 2, 3(A), and 4—*Miranda* and the wire recordings

These three claims are based on Carroll's argument that the wire recordings should have been suppressed because his interrogation violated his *Miranda* rights.  In ground 2 Carroll argues that the court violated his Fifth, Sixth, and Fourteenth Amendment rights when it admitted the wire recordings into evidence despite the police failing to comply with *Miranda* when they questioned him. (ECF No. 23 at 20-22.)  In ground 3(A) Carroll argues that his trial counsel was ineffective for failing to move to suppress the wire recordings due to the *Miranda* violation. (*Id*. at 22-23.)  In ground 4 Carroll argues that his appellate counsel was ineffective for failing to raise federal ground 2 to the state appellate court. (*Id*. at 27.)

**Wire recordings**

During his interrogation, Carroll offered to wear a wire to prove that he did not intend for Hadland to be killed.  Three days later Carroll met Detective McGrath and an FBI agent who provided the recording device near Simone's Auto Body shop.  Carroll, wearing the wire, went to shop to meet Espindola and Little Lou.[22]  Before Carroll went in, McGrath explained to him that the device he was wearing would record but not transmit.  So McGrath told Carroll that if he was in distress he should scream as loudly as possible, and if he came outside he should wave his hands above his head, so police understood that they needed to go in.  McGrath testified that he did not give Carroll specific things to talk about nor suggest a strategy on how to phrase his remarks or questions, partly because Carroll was "adamant" that he knew what he was going to do.[23]  When Carroll met with Espindola and Little Lou, he told them, "Hey, what's done

---

[22] *See*, *e.g.*, ECF No. 36-23 at 103-159, 162-180.
[23] *Id*. at 164.

is done.  You wanted him fucking taken care of.  We took care of it."[24]  Espindola responded, "Why are you saying that shit?  What we really wanted was for him to be beat up...."[25]  Carroll said, "I already told you [Counts] went fucking stupid."[26]  Defense counsel asked McGrath whether those statements corroborated Carroll's version that the intent was only to beat up Hadland, and McGrath said yes.  Carroll had told detectives during the interrogation that he initially lied to them because Espindola had instructed him on what he should say to police.  When Carroll wore the wire Espindola discussed what Carroll should say if police picked him up.

When Carroll left the shop and met up with McGrath, he gave McGrath $1,400 and a bottle of liquor that Little Lou had given him.  Carroll told police that they would hear Espindola and Little Lou on the recording.  McGrath asked Carroll to return to the auto body shop another day again wearing a wire.  Police waited until Mr. H. was inside before Carroll entered.  Carroll met again with Espindola and Little Lou.  At one point Carroll says, "… I did everything you guys asked me to do.  You told me to take care of this guy and I took care of him."[27]  Espindola responded, "talk to the guy, not fucking take care of him...."[28]

**Ground 2**

Ground 2—that the wire recordings should have been inadmissible due to the *Miranda* violation—is unexhausted and would be procedurally barred if Carroll returned to state court to raise the claim. (*See* ECF No. 44 at 5.)  Ground 4—that appellate counsel failed to raise this claim—is exhausted. (*See* ECF No. 38-53 at 3-4.)  Carroll argues that ground 4 provides cause to excuse his defaulted underlying claim ground 2. *See Edwards v. Carpenter*, 529 U.S. 446 at 451 (2000).

Carroll did not argue on appeal that the wire recordings should not have been admitted due to the earlier *Miranda* violation.  Instead Carroll argued that the wire

---

[24] *Id*. at 142.
[25] *Id*. at 142-143.
[26] *Id*. at 146.
[27] *Id*. at 155.
[28] *Id*. at 156.

recordings should not have been admitted against him at trial because they were not relevant, were prejudicial, consisted of inadmissible hearsay, and violated his right against self-incrimination. (ECF No. 38-3 at 81-95.)  The Nevada Supreme Court disagreed:

> **Wire recordings**
>
> ***Whether the relevance of the recordings was substantially outweighed by unfair prejudice***
> …
>
> Here, Carroll's argument that the recordings were not relevant is without merit. Even under Carroll's account of the facts, the purpose of the recordings was to get the managers of the Palomino Club to corroborate Carroll's claim that he was supposed to beat up Hadland, not kill him. If the recordings accomplished exactly what Carroll wanted, they would have made it less probable that Carroll intended for Hadland to die. Unfortunately for Carroll, there was evidence on the tapes to support both his position that this was never meant to be a killing, and the State's position, that it was.
>
> Carroll's argument that the tapes' probative value was substantially outweighed by their unfairly prejudicial effect also fails. The central issue of this case was Carroll's intent before and during the shooting. Any evidence allowing the jurors to ascertain his intent is extremely probative. Further, the jury heard the proper context for Carroll's statements—that the tapes were made as part of the investigation, Carroll wore the wire to get incriminating information from the other players, and his statements were fabrications. Because the probative value was great, and the danger of unfair prejudice or confusion was mostly, if not completely, explained away, we conclude that the district court did not commit plain error when it admitted the tapes.
>
> Because Carroll is unable to demonstrate plain error, we conclude that the district court did not plainly err when it admitted the recordings at trial. We so conclude because relevancy is a very broad standard and the tapes could prove Carroll's intent. Also, because Carroll's intent was the primary issue at trial, the probative value is not substantially outweighed by the unfairly prejudicial effect.
>
> ***Whether Carroll's statements were inadmissible hearsay***
> …
>
> Carroll's argument that his statements were inadmissible hearsay is not supported by the evidence. The State offered the statements to provide context to those of the Palomino Club managers. Further, had the State offered Carroll's statements for their truth, they would still be admissible as statements of a party pursuant to NRS 51.035(3)(a). Carroll claims the

detectives told him what to say, but the evidence at his trial showed the detectives simply assisted with general subject matter; Carroll decided what to say and how to say it. Carroll's recording device could not transmit live audio, so the detectives could not communicate with Carroll while he recorded. Accordingly, we conclude that the wire recordings were admissible because there is no evidence before this court at this time indicating the police directly instructed Carroll what to say. We also conclude that the recordings were admissible because Carroll's statements were not offered to prove their truth.

**Whether the statements of the managers of the Palomino Club were made in furtherance of the conspiracy**

…

Here, Carroll's argument that he was no longer a coconspirator is without merit. This court has ruled that the defendant need not be a member of the conspiracy at the time the statement was made, so long as the declarant was part of the conspiracy when the statement was made and the defendant was a part of the same conspiracy at some point. … Although Carroll was assisting the police at the time of the wire recording, the Palomino Club managers believed they were still trying to avoid detection. Therefore, the district court did not err when it determined the managers were Carroll's coconspirators pursuant to NRS 51.035(3)(e). Moreover, Carroll did not make his withdrawal known to his coconspirators. Lastly, we cannot conclude that he truly made a "clean breast" to authorities because he told multiple stories to the detectives in order to minimize his culpability.
. . .

Carroll's argument that the statements were not made in furtherance of the conspiracy is likewise unsuccessful. … Here, the managers made their statements prior to arrest. We conclude that these statements were admissible because even if Carroll had withdrawn from the conspiracy, the other members had not. Thus, the managers' statements were in furtherance of the conspiracy.

**Whether the club managers' statements violated Carroll's right against self-incrimination**

…

Carroll complains that the admission of the wire recordings put him between the proverbial rock and a hard place in deciding whether to testify. However, the same may be said about essentially every incriminating piece of evidence the State offers in any criminal prosecution. Facing such a difficult decision to testify does not violate a defendant's constitutional rights. *See Dzul v. State*, 118 Nev. 681, 693, 56 P.3d 875, 883 (2002) ("[T]he Fifth Amendment does not insulate a defendant from all difficult choices that are presented during the course of criminal proceedings...." (internal quotations omitted)). Because Carroll did not testify and was still able to put the recordings in the proper context, he fails to demonstrate that

his constitutional right against self-incrimination was violated. Therefore, we conclude that the district court did not abuse its discretion when it admitted Carroll's or his coconspirators' statements from the wire recordings. …

(ECF No. 38-17 at 5-12.)

Affirming the denial of Carroll's state postconviction petition, the Nevada Court of Appeals held that trial counsel was not ineffective for failing to move to suppress the wire recordings due to the *Miranda* violation (federal ground 3(A)):

> … Carroll claimed counsel should have moved to suppress recordings of conversations he had with his coconspirators on the ground that the recordings were derived from a *Miranda*[FN 3] violation and were thus fruit of the poisonous tree. On direct appeal, the Nevada Supreme Court held that, although Carroll's statement to police was not coerced, Carroll was subjected to custodial interrogation without the benefit of adequate *Miranda* warnings and his entire statement to detectives should have been suppressed as a result. *Carroll v. State*, 132 Nev. 269, 280, 285-87, 371 P.3d 1023, 1031, 1034-35 (2016).
>
> During the custodial interrogation, Carroll volunteered to wear a wire when he next spoke with his coconspirators. He was then released from custody and taken home. Three days later, Carroll met with law enforcement to be fitted with a wire and to record the first conversation. Even if Carroll's initial offer to wear a wire were the product of the custodial interrogation, the three days out of custody were sufficient to render the recordings too attenuated from the *Miranda* violation to justify exclusion. *See Oregon v. Elstad*, 470 U.S. 298, 312-14 (1985) (recognizing the causal connection between a violation and an ultimate decision to cooperate may be too speculative and attenuated to warrant exclusion). And Carroll did not contend he was subjected to custodial interrogation at the time he was fitted with and was wearing the wire. We therefore conclude the district court did not err by denying this claim.

[FN3: *Miranda v. Arizona*, 384 U.S. 436 (1966).]

(ECF No. 38-53 at 3-4.)

Finally, the Nevada Court of Appeals held that for the reasons it rejected the claim (federal ground 3(A)) that trial counsel was ineffective for failing to argue that the wire recordings should have been suppressed due to the *Miranda* violation, appellate counsel was similarly not ineffective:

> … Carroll claimed [appellate] counsel was ineffective for not challenging the trial court's admission of the wire recordings on the ground that the recordings were derived from *Miranda* violations and thus fruit of the

21

poisonous tree. . . . For the reasons discussed above, Carroll failed to demonstrate counsel was objectively unreasonable or a reasonable probability of a different outcome on appeal had counsel acted differently.

(ECF No. 38-53 at 8.)

**Ground 2 fails on the merits**

Carroll claims that the trial court erred in admitting the wire recordings due to the *Miranda* violation during his interrogation. (ECF No. 23 at 20-22.)  In rejecting that appellate counsel was ineffective for not raising this claim, the Nevada Supreme Court concluded that because Carroll went home after the interrogation and then met detectives three days later to record the conversations, the recordings were too attenuated from the *Miranda* violation to justify exclusion.

In *Oregon v. Elstad*, the Supreme Court considered a situation where police went to the home of an 18-year-old and his parents because they thought he was involved in the robbery of a neighbor. 470 U.S. 298 (1985).  One officer stepped into the kitchen with the mother in order to explain that they had a warrant for her son's arrest for the burglary of a neighbor's residence.  The other officer sat with the suspect in the living room.  The officer recounted that:

> I sat down with Mr. Elstad and I asked him if he was aware of why Detective McAllister and myself were there to talk with him.  He stated no, he had no idea why we were there.  I then asked him if he knew a person by the name of [the neighbor], and he said yes, he did, and also added that he heard that there was a robbery at the house.  And at that point I told Mr. Elstad that I felt he was involved in that, and he looked at me and stated, "Yes, I was there."

*Id*. at 300-301.

Officers transported Elstad to Sheriff's headquarters in the back of a patrol car. About an hour later, officers read from the standard card to advise him of his *Miranda* rights.  Elstad indicated that he understood his rights and still wished to speak with the officers.  Elstad gave a full confession, which he reviewed and signed.

At trial defense counsel moved to suppress the oral statement and the signed confession.  Counsel argued that "the statement [defendant] made in response to

questioning at his house 'let the cat out of the bag,' citing *United States v. Bayer*, 331 U.S. 532 (1947), and tainted the subsequent confession as 'fruit of the poisonous tree,' citing *Wong Sun v. United States*, 371 U.S. 471 (1963)." *Id*. at 302.  The Court excluded the statement "I was there," because the defendant had not been advised of his *Miranda* rights.  The Court held that the defendant gave the written statement freely, voluntarily, and knowingly after he had waived his right to remain silent and have counsel present. *Id*. at 302.  The Court noted that the *Miranda* rule "does not require that the statements [taken without complying with the rule] and their fruits be discarded as inherently tainted." *Id*. at 307.  The Court held that exclusion of the written statement was unwarranted; "the causal connection between any psychological disadvantage created by his admission and his ultimate decision to cooperate is speculative and attenuated at best." *Id*. at 313-314.

Here, after detectives read Carroll his *Miranda* rights, he continued to talk to them. He also volunteered to wear a wire in order to prove he did not intend Hadland's death. He then returned home.  While detectives should have read Carroll his rights at the outset, the interview was not coercive. (*See* order of affirmance of convictions, ECF No. 38-17 at 23.)  The Supreme Court has held that failure to administer *Miranda* warnings does not bar the introduction of evidence the police discovered due to the defendant's voluntary but unwarned statements. *United States v. Patane*, 542 U.S. 630, 634 (2004). Three days after Carroll first spoke with detectives, he drove himself to meet them and wore the wire into the auto body shop.  *Elstad* is not precisely on all-fours with Carroll's situation.  However, the Court notes that in *Elstad* the break in time that severed the causal connection between the *Miranda* violation and the subsequent statement was a matter of a couple of hours.  Carroll was home for days before he met detectives again. The Court concludes that ground 2 fails even on *de novo* review.  Accordingly, federal habeas relief is denied as to ground 2.

**Ground 3(A)**

This is the claim that trial counsel was ineffective for failing to move to suppress the wire recordings on the basis of the *Miranda* violation. (ECF No. 23 at 22-23.)  At trial, defense counsel noted that when the first wire recording was made Detective McGrath had not spoken to Espindola or Little Lou and wouldn't have been able to recognize their voices. (ECF No. 36-23 at 5-17.)  So counsel questioned whether that presented a foundation or authentication issue.  He also stated that it was his understanding that Espindola helped the prosecution with the transcript of the recordings. (*Id*. at 7.)  Ultimately counsel made no objection.

As set forth earlier, the Nevada Court of Appeals held that counsel was not ineffective:

> … Carroll claimed counsel should have moved to suppress recordings of conversations he had with his coconspirators on the ground that the recordings were derived from a *Miranda*[FN 3] violation and were thus fruit of the poisonous tree. On direct appeal, the Nevada Supreme Court held that, although Carroll's statement to police was not coerced, Carroll was subjected to custodial interrogation without the benefit of adequate *Miranda* warnings and his entire statement to detectives should have been suppressed as a result. *Carroll v. State*, 132 Nev. 269, 280, 285-87, 371 P.3d 1023, 1031, 1034-35 (2016).
>
> During the custodial interrogation, Carroll volunteered to wear a wire when he next spoke with his coconspirators. He was then released from custody and taken home. Three days later, Carroll met with law enforcement to be fitted with a wire and to record the first conversation. Even if Carroll's initial offer to wear a wire were the product of the custodial interrogation, the three days out of custody were sufficient to render the recordings too attenuated from the *Miranda* violation to justify exclusion. *See Oregon v. Elstad*, 470 U.S. 298, 312-14 (1985) (recognizing the causal connection between a violation and an ultimate decision to cooperate may be too speculative and attenuated to warrant exclusion). And Carroll did not contend he was subjected to custodial interrogation at the time he was fitted with and was wearing the wire. We therefore conclude the district court did not err by denying this claim.

[FN3: *Miranda v. Arizona*, 384 U.S. 436 (1966).]

(ECF No. 38-53 at 3-4.)

This Court has already concluded that the trial court did not err in admitting the wire recordings.  It follows that trial counsel was not ineffective for failing to challenge the

admission of the wire recordings based on the *Miranda* violation.  Failure to take a futile or meritless action or motion does not constitute deficient performance. *See Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986); *Wilson v. Henry*, 185 F.3d 986, 991-92 (9th Cir. 1999) (counsel not ineffective where motion for new trial "would have been to no avail."); *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) (counsel was not ineffective where the motion that allegedly should have been made would have been futile). Carroll fails to show that there was a reasonable probability of a different result if counsel had challenged the admission of the wire. *See Strickland*, 466 U.S. at 700. Carroll has not demonstrated that the Nevada Court of Appeals' decision on federal ground 3(A) was contrary to, or involved an unreasonable application of, *Strickland*, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).  The Court denies federal habeas relief on ground 3(A).

**Ground 4**

This is Carroll's claim that appellate counsel was ineffective for failing to raise the claim that the trial court erred in admitting the wire recordings due to the *Miranda* violation. (ECF No. 23 at 27.)  Appellate counsel does not have a constitutional obligation to raise every nonfrivolous issue. *Jones v. Barnes*, 463 U.S. 745, 751 (1983). Experienced appellate counsel recognize that it is important to focus on the strongest issue or a few key issues. *Id*. at 751-52.  A petitioner must demonstrate that but for counsel's errors, he would have prevailed on appeal. *Smith v. Robbins*, 528 U.S. 259, 288 (2000) (citation omitted).  As set forth above, the Nevada Court of Appeals held that, similarly to trial counsel,  appellate counsel was not ineffective:

> … Carroll claimed [appellate] counsel was ineffective for not challenging the trial court's admission of the wire recordings on the ground that the recordings were derived from *Miranda* violations and thus fruit of the poisonous tree. . . . For the reasons discussed above [rejecting the trial counsel IAC claim], Carroll failed to demonstrate counsel was objectively unreasonable or a reasonable probability of a different outcome on appeal had counsel acted differently.

(ECF No. 38-53 at 8.)

Again, the trial court did not err in admitting the wire recordings, and appellate counsel was not ineffective for failing to raise a claim that would not succeed. *See Kimmelman,* 477 U.S. at 375; *Wilson,* 185 F.3d at 991-92; *James,* 24 F.3d at 26. Carroll has not demonstrated a reasonable probability of a different outcome on appeal had appellate counsel raised the issue. He has not shown that the Nevada Court of Appeals' decision on federal ground 4 was contrary to, or involved an unreasonable application of, *Strickland*, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). The Court, therefore, denies federal habeas relief on ground 4.

### iii.   Ground 3(B)—impeachment of Zone's testimony

Carroll contends that his trial counsel was ineffective for failing to impeach Rontae Zone with his prior statement to Calvin Williams. (ECF. No. 23 at 23-26.)

The Nevada Court of Appeals disagreed:

> … Carroll claimed counsel failed to present exculpatory evidence and impeach Rontae Zone with evidence that Zone had admitted to murdering Timothy Hadland himself. Zone was the only percipient witness to the murder who testified at Carroll's trial. Zone's testimony indicated Carroll facilitated Hadland's murder and codefendant Kenneth Counts was the shooter. Prior to Carroll's trial, Zone testified to substantially the same information at Counts' trial. At Counts' trial, Zone was impeached with the testimony of Calvin Williams, who testified that Zone implicated himself as Hadland's shooter. Counts was acquitted. Carroll argued that he, too, would have enjoyed a more favorable outcome at trial had Williams' testimony been admitted at trial.
>
> Williams' testimony constituted extrinsic evidence. And extrinsic evidence that is not directly connected to the issue in dispute is inadmissible. *Lobato v. State*, 120 Nev. 512, 518, 96 P.3d 765, 770 (2004). The State pursued a theory that Carroll was culpable for murder as a coconspirator but that Counts was the shooter. Thus the primary issue at Carroll's trial was his intent, not the identity of the shooter. Because the shooter's identity was not in dispute, Williams' testimony would have been inadmissible under the collateral fact rule. As a result, it would have been futile for counsel to seek to admit Williams' testimony to impeach Zone. And counsel cannot be ineffective for failing to make futile gestures. *See Ennis v. State*, 122 Nev, 694, 706, 137 P.3d 1095, 1103 (2006).

Moreover, Carroll failed to demonstrate a reasonable probability of a different outcome had Williams' testimony been admitted. As stated previously, any suggestion that the State misidentified the shooter would not have been exculpatory because Carroll was not prosecuted under a theory that he was the triggerman. And trial counsel thoroughly impeached Zone's credibility on the witness stand, demonstrating repeatedly that Zone had lied under oath on previous occasions. We therefore conclude the district court did not err by denying this claim.

(ECF No. 38-53 at 4-5.)

Zone testified at Counts's trial that Counts was the shooter. (ECF No. 23 at 23-26.)  At that trial, defense counsel asked Zone if he knew and had had a relationship with Calvin Williams. (ECF No. 67-10 at 101-103.)  Zone denied knowing Williams.  The defense then called Williams. (ECF No. 67-13 at 199-209.)  Williams testified that he had had a romantic relationship of several months with Zone.  He said that on one occasion he and Zone were at a Las Vegas motel.  They got into a heated argument about Williams's infidelity.  Zone pulled out a gun and began yelling at Williams.  Williams testified that Zone said, "If you want to play me, I'll play you. . . . I'll put two in your head like I did that fool from the Palomino Club." (*Id*. at 202.)  On cross-examination Williams stated that when he was incarcerated with Counts he heard from another inmate that Counts had been talking about Zone and the Palomino.  Williams ultimately talked to Counts about Zone and agreed to tell Counts's lawyers what Zone had said.  Williams did not recall the other inmate's name.  Carroll asserts that he was prejudiced because the State's case primarily relied on the police interview, wire recordings, and Zone's testimony.  So he argues that Williams's testimony would have undermined Zone's credibility.

Under Nevada law, impeachment through extrinsic evidence is impermissible when collateral to the proceeding but extrinsic evidence of a prior inconsistent statement is admissible if it is material to the issue in dispute. *Lobato v. State*, 96 P.3d 765, 770 (Nev. 2004).  The so-called collateral fact rule has limited application.  For example, "extrinsic evidence relevant to prove a witness's motive to testify in a certain way, *i.e*., bias, interest, corruption, or prejudice, is never collateral to the controversy."

27

Id.  So at Carroll's trial, if Zone denied knowing Williams, defense counsel could have called Williams to testify to show that Zone's motive in testifying was to protect himself.[29]  At issue in Carroll's trial was whether Carroll intended that Hadland be beaten up or killed.  But Williams's testimony might have challenged the credibility of Zone's entire version of events.

Assuming that defense counsel ineffectively failed to call Williams to testify, any deficiency must have prejudiced Carroll.  Carroll must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  Carroll consistently identified Counts as the shooter— including on the wire recordings.  He never implicated Zone.  Further, Carroll's counsel put Zone's credibility at issue when he extensively questioned Zone about his motives for testifying and highlighted inconsistencies in his account to police.[30]  Zone conceded that he initially lied to the police in order to protect himself.  Defense counsel asked Zone whether he cared how he answered the questions as long as he wasn't charged with murder, and Zone responded, "Why should I?"[31]  Zone also said that he did not care what happened to Carroll as long as he was not charged with murder.[32]  Defense counsel elicited testimony from Zone about his frequent use of marijuana, including on the night in question and even the morning of the day he testified.[33]  This Court concludes that any deficiency by defense counsel did not prejudice Carroll here, where defense counsel elicited substantial testimony that Zone's motive in testifying was to protect himself.[34]  Federal habeas relief is denied on ground 3(B).

The Petition, therefore, is denied in its entirety.

---

[29] It is unclear whether Williams would have been available to testify.  An investigator for the defense had unsuccessfully tried to locate Williams before trial. (*See* ECF No. 24-6.)
[30] *See*, *e.g.*, ECF No. 36-19 at 172-175.  *See also Lobato*, 96 P.3d at 771.
[31] ECF No. 36-19 at 180.
[32] *Id*. at 240.
[33] *See also* defense closing arguments at ECF No. 36-27 at 70-81, 84.
[34] *See*, *e.g.*, *Lobato*, 96 P.3d at 772.

## IV.    Certificate of Appealability

This is a final order adverse to the Petitioner. As such, Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a Certificate of Appealability ("COA").  Accordingly, the Court has *sua sponte* evaluated the claims within the Petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right."  With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id*.

The COA standard is not high.  Carroll must only "'sho[w] that reasonable jurists could debate'" the district court's resolution or that the issues are "'adequate to deserve encouragement to proceed further.'" *Hayward v. Marshall*, 603 F.3d 546, 553 (9th Cir. 2010) (en banc) (citations omitted).  Having reviewed its determinations and rulings in adjudicating Carroll's Petition, the Court concludes that the *Slack* standard is met with respect to this Court's ruling on the merits of Ground 1.  The Court declines to issue a Certificate of Appealability for its resolution of any other procedural or substantive issues.

## V.      Conclusion

It is therefore Ordered that the First-Amended Petition (ECF No. 23) is **DENIED**.

It is further Ordered that a Certificate of Appealability will issue for Ground 1 only.

The Clerk of the Court is directed to:

- Substitute Débora Borgas for Respondent State of Nevada; and
- Enter judgment accordingly and close this case.

DATED: 15 May 2026.

_____
GLORIA M. NAVARRO
UNITED STATES DISTRICT JUDGE